So Ordered.

Dated: December 10, 2021



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Craig A. Pope,                        Case No. 20-22889-gmh
    *dba* C.A. Pope Inc.,
    *dba* August & Littles LLC,
    *dba* Prospect Hills LLC, and

    Cathleen A. Pope,

    Debtors in possession.             Chapter 11

**DECISION AND ORDER DENYING PLAN CONFIRMATION**

    This decision and order denies confirmation of the debtors' fourth amended plan for the following reasons.

# I

The court held a confirmation hearing on the debtors' third amended chapter 11 plan on November 3, 2021. The United States trustee and Bruce and Kathryn Gingrich objected. The court denied confirmation of the third amended plan because it modified the rights of the Gingriches, who hold a claim secured only by the debtors' principal residence, in violation of 11 U.S.C. §1123(b)(5). The court granted the debtors' request for leave to file a fourth amended chapter 11 plan, which the debtors proposed could be considered for confirmation based on the evidence admitted at the November 3 hearing. The court ordered the debtors to file with the fourth amended plan "an explanation of [ ] the changes in the fourth amended plan" and a statement of how "the court can confirm the fourth amended plan based on the evidence presented at the November 3, 2021 confirmation hearing". ECF No. 271, at 2. The court also required the United States trustee and the Gingriches to "file a letter or objection stating their positions on the fourth amended plan" "[b]y no later than November 19, 2021". *Id.*

The debtors filed a fourth amended plan on November 12, 2021, along with a statement in support of confirmation. ECF Nos. 269 & 270. The United States trustee objected. ECF No. 274. The Gingriches did not file a statement addressing their objection, but the debtors filed a stipulation in which the Gingriches agree to extend the maturity date of their land contract with the debtors and the debtors agree to incorporate the terms of the stipulation into the fourth amended plan. ECF No. 272. Based on the stipulation and the fourth amended plan's incorporation of its terms, the court presumes that the Gingriches do not object to confirmation of the fourth amended plan.

## II

### A

To confirm their plan the debtors must show, among other things, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor[s] . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11); see also *id.* at §1191(a) & (b). Considering the fourth amended plan based on the evidence presented at the November 3 hearing, the debtors have not met their burden to demonstrate by a preponderance of the evidence that the plan complies with §1129(a)(11).

### B

#### 1

The debtors' fourth amended plan relies on three funding sources: (1) proceeds from the preconfirmation sale of real estate, which are currently held by the debtors and the subchapter V trustee, (2) income generated from Craig Pope's trucking business, and (3) funds from real estate sales after confirmation—specifically, the proposed sale of 21 vacant single-family lots and a property located on Janesville Street in Whitewater, Wisconsin (the "Janesville Street Property").

The debtors' plan-feasibility analysis commits all net income from Mr. Pope's trucking business to paying the debtors' living expenses and making monthly payments required by the plan. ECF No. 269, at 6 & 27, Ex. C. The debtors' plan dedicates all remaining preconfirmation-sale proceeds to pay the secured claims of Harrison, Williams & McDonell, LLP, a portion of the secured claim of the Wisconsin Department of Revenue, and a percentage of claims secured by judgment liens. See Ex. 8, ECF No. 253-8 & ECF No. 269, at 26, Ex. B. All remaining payments required by the plan depend on funds generated from post-confirmation sales of the debtors' remaining real estate.

Whether the debtors' plan is likely to be followed by liquidation or a need for further financial reorganization thus depends in part on whether proceeds from the sale of their 21 vacant lots will generate sufficient funds for the debtors to meet the plan's remaining payment obligations. The debtors propose to use the net proceeds from the sale of the lots as stated in the following financial-projection chart that they submitted:

**Second Amended Financial Projections**

As for the proceeds from the sale of the Lots, if sold for $500,000:

|  |  |  |
|---|---|---|
|  | $500,000 |  |
| Less | $119,209 | RE taxes to County |
|  | $ 25,000 | Commission to Linda |
| Sub Total | $355,791 |  |
|  |  |  |
| Less | $135,750 | Estimated Balance owed Wis DOR for it secured claim |
|  | $ 70,000 | Estimated Repairs for Janesville Rd property |
|  | $150,041 | These funds to be used to pay the following: |
|  |  |  |
| Less | $ 46,428 | Wis. DOR's priority claim (in full) |
|  | $ 30,612 | IRS priority claim (in full) |
|  | $  5,000 | Sub-V Tee's estimated fees (in full) |
|  | $68,001 | Applied to Krekeler Strother Fees (upon court approval; pays the majority of the total, but probably not full amount) |

Ex. 6, ECF No. 253-6.

When the debtors sell the lots they must first pay the delinquent real estate taxes associated with the lots sold and pay the remainder of the secured claim owed to the Wisconsin Department of Revenue. After paying those claims, the debtors must pay presumptively allowed administrative expenses—the real estate broker's commission and fees to the trustee and debtors' counsel—followed by the priority claims held by the Wisconsin Department of Revenue and the Internal Revenue Service. As the debtors' chart shows, the debtors also project sufficient net sale proceeds to provide $70,000 to repair their Janesville Street Property after paying other claims and expenses.

The debtors' plan also commits them to making monthly post-confirmation payments to the Wisconsin Department of Revenue and the IRS until the debtors have sufficient lot-sale proceeds to pay these tax claims and administrative expenses. The plan requires the debtors to pay the Wisconsin Department of Revenue's allowed claims, which consist of a $46,428 priority claim and a $135,750 secured claim, in full with 12% interest and to make monthly payments on those claims of $1,222.60 and $2,825.20, respectively, until the lots are sold.[1] ECF No. 269, at 8–9 & 11; see also ECF No. 253-6, Ex. 6. The plan pays the IRS's allowed priority tax claim in full with 3% interest and requires monthly payments of $686.16 until the lots are sold. *Id*. at 8–9.

Section 1129(a)(9)(C)(ii) requires the debtors to pay the §507(a)(8) priority claims owed to the Wisconsin Department of Revenue and the IRS within five years from the petition date, that is by April 16, 2025. See also *id*. at 9. If the court were to confirm the debtors' plan in December 2021 and they began making payments in January 2022, they would have approximately 39 months to sell the lots before they would need to complete full payment of those claims. Presuming that the debtors would take the entire 39 months to sell the lots—a presumption that most favors plan confirmation— and make monthly payments to reduce the priority claims and secured claim of the Wisconsin Department of Revenue for that entire period, then the debtors at month 39 would require lot-sale proceeds of $368,497.56 to adequately fund the plan, as shown in the following chart:

---

[1] The Wisconsin Department of Revenue filed a secured claim for $282,520.13, but the plan proposes to pay $146,770 within 30 days from the effective date of the plan using funds on hand, thus reducing the amount to be paid using the plan's other revenue sources to about $135,750. ECF No. 269, at 11; see also Claim 2-4.

| Plan obligation | Debt amount listed on Exhibit 6 | Interest accrued | Subtotal | Credit for post-confirmation payments required by the plan | Total |
|---|---|---|---|---|---|
| Real estate taxes | $119,209 | $25,341 (12%) | $144,550 | - | $144,550 |
| WI DOR secured[2] | $135,750 | $28,857 | $164,607 | $110,182.80 | $54,424.20 |
| WI DOR priority | $46,428 | $9,869 | $56,297 | $47,681.40 | $8,615.60 |
| IRS priority | $30,612 | $1,555 | $32,167 | $26,760.24 | $5,406.76 |
| SubV Trustee | $5,000 | - | - | - | $5,000 |
| Krekeler Strother | $68,001 | - | - | - | $68,001 |
| Janesville remodel | $70,000 | - | - | - | $70,000 |
| Realtor Comm. Based on 5% of $250,000 | - | - | $12,500 | | $12,500 |
| **TOTAL:** | | | | | **$368,497.56** |

The plan's feasibility thus depends on the debtors demonstrating that the lots will generate at least $369,000 of net proceeds.[3] The evidence presented, however, was insufficient to enable the court to make a reasonable finding about the market value of the lots during the plan's time horizon.

3

Craig Pope purchased the land that he subsequently divided into the 21 single-family vacant lots around 2000. Mr. Pope testified that the individual lots were ready to

---

[2] The plan states that the monthly payments on the Wisconsin Department of Revenue's secured claim are interest only, but that appears to be an error because the monthly payments proposed ($2,825.20) exceed the amount of interest that accrues each month on the $135,750 remaining secured claim. See ECF No. 269, at 11. In analyzing plan feasibility, the court presumes that the debtors will pay both principal and interest on that claim.

[3] The plan does not appear to provide for any post-confirmation payment of real estate taxes that will accrue before the debtors sell the vacant lots. Thus, future tax liability will also reduce the net proceeds available to fund the plan, a further feasibility difficulty that is not material to this decision's analysis.

sell in approximately 2004 or 2005, but, because he wanted to develop those properties himself, he never actively marketed them until after he filed this bankruptcy case.

The Popes' efforts to sell the vacant lots while debtors in possession have neither borne fruit nor shown promise of a plentiful harvest. They employed Linda Platner to market the lots. But her listing contract expired in the fall of 2021 without any meaningful results or showing of buyer interest at prices Mr. Pope would accept.

Ms. Platner testified. She reported that the debtors received three written offers to purchase the lots. She testified that a master listing contract was negotiated with a construction company, but that company ultimately committed to buying only a single lot. That was unacceptable to Mr. Pope. Ms. Platner explained that she then listed the lots for sale on the multiple listing service. In May 2021 a potential purchaser made a $20,000 offer for a single lot. Mr. Pope did not respond to this offer. In September 2021 the City of Whitewater expressed an interest in purchasing the lots and subsequently made a written offer to buy all 21 lots for $250,000. But Mr. Pope terminated further negotiations with the City.

Mr. Pope also testified about the lots. He justified the plan's assumption that the lots can be sold for $500,000 based on his understanding that at some point one or more representatives of the City of Whitewater verbally indicated that the City might be willing to purchase all 21 lots for that price. No one from the City testified. The debtors offered no expert opinion on the value of the lots.

The only meaningful evidence of how much the City is willing to pay for the lots is its $250,000 written offer. Mr. Pope testified that the City's representatives have suggested that the vacant lots have infrastructure problems that decrease their value. The debtors' fourth amended plan acknowledges the existence of the City's suggestion, stating, "[t]he City of Whitewater . . . recently expressed concerns about the water

infrastructure under the Lots which could reduce their value." ECF No. 269, at 2. When asked the value of the vacant lots during his testimony, Mr. Pope responded that he did not know. And Ms. Platner was not asked to testify about the value the lots nor did she offer an opinion of their value. Ms. Platner did testify that she believes the City remains interested in purchasing the lots and would pay $250,000 for them. But she did not explain why she holds this belief, an omission that deprives the testimony of meaningful weight.

In all events, the City's $250,000 offer for the lots would be too low to adequately fund the plan. As illustrated in the chart above, the debtors' plan requires them to generate sale proceeds of at least $369,000. Perhaps Mr. Pope is correct that the City's $250,000 written offer understates the lots' true value, but the evidence neither adequately supports a finding that their total value exceeds $250,000 nor offers any credible basis from which the court might determine by how much their value exceeds that amount.[4] The evidence also does not support a finding that the necessary sale proceeds, even if achievable, will be achieved during the plan term. Consequently, the debtors did not prove that confirmation of their plan will likely avoid liquidation or a need for further financial reorganization, as required by §1129(a)(11).[5]

---

[4] The plan states, "[p]ursuant to Walworth County's records the Lots vary in assessed value between $50,900 to $38,900", ECF No. 269, at 2, but the debtors presented no credible evidence of the lots' assessed value.

[5] If the debtors see a different course to confirmation that is feasible, they did not sufficiently explain it, even after the court gave them the opportunity to do so in connection with filing their fourth amended plan. With regard to the lots' value, their statement in support of confirmation asserts only, "Debtors testified that they will take an aggressive approach to selling the Vacant Lots by reducing the price previously sought from the assessed value of the Lots to . . . $500,000" and that they are in the process of "identifying realtors to take a more aggressive approach to marketing the Lots for sale". ECF No. 270, at 2. A promise to market aggressively in the future does not remedy the lack of evidence showing that the debtors can timely sell the lots for an amount sufficient to fund the plan. Any arguments in support of confirmation that are not addressed above were too vague, perfunctory, or ill-formed to explain how the court can conclude that the plan is feasible; thus, they are forfeited. See *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d

C

Even if the debtors had demonstrated that selling the vacant lots would timely generate $369,000 to fund the plan, the plan's feasibility also depends on the debtors proving that they will be able to sell the Janesville Street Property for an amount sufficient to yield an additional $90,000 to make required payments to creditors. The evidence does not support that finding either.

1

The debtors' plan contemplates that proceeds from the sale of the Janesville Street Property will be sufficient to pay unsecured creditors and the balance owed on their land sale contract after paying real estate taxes and realtor commissions. ECF Nos. 253-6, Ex. 6 & 269, at 1–12. The debtors' ability to pay off the land sale contract depends on sales of both the vacant lots and the rehabilitated Janesville Street Property. Because the evidence does not support a finding that the debtors will be able to sell their vacant lots for enough to finance the Janesville Street Property's rehabilitation, the court cannot find that the debtors will be able to make the lump-sum payment to pay off the land sale contract by March 2022 or at any time during the plan term. Because the fourth amended plan provides a foreclosure remedy for the debtors' failure to make the lump-sum payment, the debtors' mere inability to timely make that payment does not entail that the plan is infeasible, however.

But the debtors' plan does require them to use proceeds from the sale of the Janesville Street Property to pay real estate taxes, unsecured creditors, and broker's fees. See ECF No. 253-6, Ex. 6. Presuming the debtors sell the Janesville Street Property at the end of the 60-month plan term—a presumption that again most favors plan

---

766, 775 (7th Cir. 2006)) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

confirmation—the debtors must sell that property for enough to net almost $90,000 (after paying a real estate broker commission) because the plan depends on those proceeds to pay $28,896 of prepetition real estate taxes and $60,000 to unsecured creditors.[6]

2

Mr. Pope purchased the Janesville Street Property around 2000. He gutted the interior of the property in the early 2000s, intending to turn it into a retail business. He never finished the project. The property has been sitting idle for approximately 12 years, with no insulation, plumbing, electrical, fixtures, cabinets, flooring, or drywall. The property is not currently habitable and requires an entire interior rebuild. The debtors' plan asserts that the property is "worth approximately $140,000" in its current state but after the interior is rebuilt, the value "will increase to approximately $250,000". ECF No. 269, at 3.

No credible evidence supports either of these assertions. Mr. Pope, who actively developed real estate more than a decade ago, testified that, based on his experience, he believes that if the Janesville Street Property were remodeled, he could sell the property for at least $250,000. Mr. Pope conceded, however, that he has not had any experience in real estate development or rehabilitation for several years, a concession that is alone sufficient to make his opinion of value unreliable. The debtors presented no other evidence of the Janesville Street Property's value.

---

[6] Exhibit 6 lists the original amount of real estate taxes for this property as $21,650. The plan provides for payment with 12% interest over 60 months ($7,246) for a total of $28,896. ECF No. 269, at 9 & 28; see also ECF No. 253-6, Ex. 6. The presumption that the debtors must sell the Janesville Street Property for almost $90,000 again ignores post-confirmation real estate taxes that will accrue before the debtors sell the property. The debtors do not appear to have budgeted for regular payment of those taxes. As a result, the debtors will have to pay those taxes and applicable interest from any sale proceeds, thus necessitating an even higher sale price to show plan feasibility.

The debtors also presented no credible evidence about how much the rehabilitation of the Janesville Street Property will cost or how long it will take. Mr. Pope testified that the necessary repairs would cost *at least* $70,000. His testimony about the debtors' ability to rehabilitate and sell the property was inconsistent and unconvincing. He never addressed the likelihood that the cost would exceed $70,000, even though he admitted that his estimate was based on his experience from many years earlier and that he has not received any current estimates for repair costs. In addition, he at times suggested that he would act as the general contractor on the project, even though he also testified that he intends to work 18-20 hours per day in his trucking business, leaving him little time to attend regularly to a remodeling effort. He also acknowledged that construction costs are volatile and labor costs have recently increased.

Mr. Pope's estimates at best amount to little more than hopeful ballpark figures premised on stale experience. His acknowledgements about his lack of recent experience, inability to commit substantial time to the restoration project, and construction-cost increases defeat the reliability of his self-interested suggestion that the debtors will be able to rehabilitate the property for around $70,000.

The debtors thus did not meet their burden to show that the Janesville Street Property will net $90,000 during the plan term, let alone the $250,000 they contemplate. For this independent reason, they failed to satisfy §1129(a)(11)'s confirmation requirement.

III

For these reasons, confirmation of the fourth amended plan is denied. So ordered.

# # # # #